UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| JEFFERY COBB, | ) | Civil No. 15-73-GFVT |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| V. | ) | **&** |
| | ) | **ORDER** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Jeffery Cobb seeks judicial review of the Commissioner of Social Security's decision to deny his application for Disability Insurance Benefits and Supplemental Security Income Benefits. For the reasons explained below, the Court will DENY Cobb's Motion for Summary Judgment [R. 9] and GRANT the Commissioner's. [R 10.]

**I**

Cobb filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") with the Social Security Administration ("SSA") in October 2011. [Tr. 194-200, 201-207.] The SSA denied his application both initially and upon reconsideration. [Tr. 34.] Cobb then requested a hearing before Administrative Law Judge ("ALJ") Ronald M. Kayser, which the parties held in August 2013. [Tr. 34.]

In evaluating Cobb's disability claim, the ALJ performed the standard sequential analysis required under 20 C.F.R. § 404.1520. This evaluation includes five steps. First, if a claimant is performing a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limits

1

his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not "disabled" as defined by the regulations. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is "disabled." 20 C.F.R. §404.1520(d). Before moving to the fourth step, the ALJ must use all the relevant evidence in the record to determine the claimant's residual functional capacity ("RFC"), which is an assessment of one's ability to perform certain physical and mental work activities on a sustained basis despite any impairment experienced by the individual. *See* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545. Fourth, the ALJ must determine whether the claimant has the RFC to perform the requirements of his past relevant work; if a claimant's impairments do not prevent him from doing past relevant work, he is not "disabled." 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments—considering his RFC, age, education, and past work—prevent him from doing other work that exists in the national economy, then he is "disabled." § 404.1520(f).

In this case, at Step 1, the ALJ found that Cobb has not engaged in substantial gainful activity from his alleged onset date of October 13, 2011. [Tr. 36.] At Step 2, he determined that Cobb suffers from the following severe impairments: status post cervical discectomy, history of polysubstance abuse, and affective mood disorder. [*Id*.] At Step 3, the ALJ found that Cobb's impairments, whether considered alone or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [*Id*.] The ALJ then considered the entire record and concluded that Cobb possessed the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1564(c) and 416.967(c). After explaining in great detail how he determined Cobb's RFC [Tr. 37-41], the ALJ found that Cobb is "capable of performing his past relevant work as a laundry worker and as an assembly line worker." [Tr. 41.]

In the alternative, he also concluded that other jobs exist in significant numbers within the national and regional economy that Cobb can perform. [Tr. 42-43.] Accordingly, on October 10, 2013, the ALJ determined that Cobb was ineligible for disability benefits. [Tr. 43.] The Appeals Council declined to review the ALJ's decision [Tr. 1-5], and this appeal followed.[1]

## II

### A

In reviewing an ALJ's decision to deny Social Security benefits, courts must determine whether there is substantial evidence in the record to support the Commissioner's judgment. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987). To find "substantial evidence," courts must perceive "more than a scintilla of evidence but less than a preponderance," which is to say that a court need only find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (internal quotations omitted) (citation omitted).

When searching the record for this evidence, courts must examine the record as a whole. *Cutlip, 25 F.3d at 286* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir.

---

[1] In his challenge to the ALJ's decision, Cobb's counsel dresses his claims in a series of overblown declarations. He characterizes the ALJ's conclusion as "[u]tterly appalling," suggests that the ALJ "scoffed at Mr. Cobb's problems," and announces that "[t]he government should be embarrassed by this finding." [R. 9-1 at 2, 4-5.] That is not an effective method of advocacy. In the future, the Court encourages counsel to focus on the facts at issue, without resorting to hyperbole or attempting to impugn the integrity of agency employees.

1981), *cert. denied*, 461 U.S. 957 (1983)). This examination, however, is limited "to the particular points that [the claimant] appears to raise in her brief on appeal." *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). Courts are not empowered to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Court finds substantial evidence to support the Commissioner's judgment, it must affirm that decision even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *Ulman, 693 F.3d at 714*; *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

**B**

Cobb challenges the ALJ's decision on two grounds. First, he argues that the ALJ's evaluation of his RFC was "not based on substantial evidence." [R. 9-1 at 5.] He supports this claim by relying almost exclusively on (1) a diagnostic report submitted by Dr. Christian Ramsey and (2) Cobb's own subjective reports of his alleged pain and numbness. For reasons readily apparent in the record, neither of these sources substantially undermines the ALJ's decision.

To begin, Cobb's first consultative examination occurred in 2011, when he visited Dr. James Owen. Dr. Owen noted that Cobb complained of numbness and back pain, but otherwise found that his "strength, sensation, and coordination [were] all within normal limits." [Tr. 337.] He also reported that there was "no obvious tenderness noted in his back," that his "bilateral lower extremities" had "grossly normal strength and tone," and that he could perform a full squat. [*Id.*] Although Cobb reported pain in his left knee, Dr. Owen stated that he "really d[id] not see any fracture" in Cobb's left knee. [*Id.*] He found "no evidence of instability" in Cobb's left knee and concluded that he had a "normal range of motion" in both knees. [*Id.*]

4

In July 2012, Dr. Ramsey made a diagnosis that proved inconsistent with parts of Dr. Owen's examination. Dr. Ramsey reported that Cobb had some "spasticity" in his lower extremities and that he suffered from a narrowing of the spinal canal known as "cervical spondylitic myleopathy."[2] [Tr. 368-69.] He concluded that an "anterior cervical decompressive operation" on Cobb's neck was necessary to address these issues. [Tr. 369.] Cobb had that surgery in August 2012. [Tr. 61.]

In his challenge to the ALJ's decision, Cobb extensively cites the symptoms described by Dr. Ramsey in his pre-surgery report. What he fails to mention is that, in every examination performed *after* this surgery, none of these symptoms reappear. At his hearing with the ALJ, Cobb himself stated that the surgery was successful, testifying that "[t]he neck's pretty well taken care of" and "Dr. Ramsey does good work." [Tr. 61.] And in a thorough post-surgery examination performed in October 2012, Dr. Keith Applegate identified none of the pre-surgery symptoms described by Dr. Ramsey.

Cobb nevertheless faults the ALJ for "inexplicably" finding that Dr. Applegate's examination was "within normal limits." [R. 9-1 at 5.] In fact, this conclusion is easy to explain: the ALJ reported that these findings were "within normal limits" because Dr. Applegate repeatedly characterized those findings as "normal." Dr. Applegate noted, for example, that Cobb had

---

[2] Cobb briefly claims that the ALJ "ignored" Dr. Ramsey's diagnoses, and that he "did not even address Dr. Ramsey's note from July 19, 2012." [R. 9-1 at 4.] But the ALJ expressly recognized that Cobb "was diagnosed with cervical spondylotic myelopathy by Christian Ramsey, MD . . . and subsequently underwent disectomies with open reduction and internal fixation at those levels without complication on August 1, 2012." [Tr. 39.] The ALJ also noted that there had been "no further follow-ups or complaints of neck pain after the claimant had his successful surgery," and that Cobb had "testified at the hearing that his neck surgery was successful." [Tr. 40.] Dr. Ramsey's report provided only a diagnosis of Cobb's condition; he gave no opinion about the functional limitations associated with that condition. The ALJ was thus not required to give Ramsey's diagnostic report specific weight. *Welch v. Colvin*, 566 F. App'x 691, 694 (10th Cir. 2014) (finding "no error in the ALJ's not weighing the physicians 'opinions'" because "each physician simply diagnosed [the claimant's] impairments and in some cases recommended treatment for them," but none "opined on [the] limitations resulting from her impairments.").

5

"grossly normal strength and tone" in his lower extremities, "normal strength, normal tone, normal range of motion," and "normal sensation" in both his hands, a "full range of motion" and "no abnormal movements" in his neck, and "normal posture, normal sensation, and normal coordination and reflexes" in his spine.[3] [Tr. 388-391.]

Undeterred, Cobb insists that his post-surgery condition is actually "quite consistent" with Dr. Ramsey's pre-surgery findings. [R. 9-1 at 3.] In support, he cites his own subjective reports of continued "numbness" and "tingling" in his extremities and a "painful gait."[4] [*Id.* at 3-4.] The ALJ understandably chose not to credit the self-serving statements of Cobb over the physical examination of a medical expert. Cobb's subjective reports notwithstanding, Dr. Applegate's physical exam—not to mention the contradictory testimony of Cobb himself—strongly suggests that the August 2012 surgery was successful. Cobb's reliance on Dr. Ramsey's pre-surgery diagnoses is misplaced, and the ALJ's reliance on Dr. Applegate's post-surgery physical examination was reasonable.[5] *See, e.g., Woolfolk v. Comm'r of Soc. Sec.,* 89 F. App'x 766, 768

---

[3] Although his challenge is rather general, Cobb does specifically fault the ALJ for finding that he could lift "50 pounds occasionally and 20 pounds frequently." [R. 9-1 at 6.] Substantial evidence supported this finding. Dr. Owen reported that Cobb had "normal strength, sensation, and coordination," including "normal range of motion" in his knees with "no evidence of instability," and that he could perform a full squat. [Tr. 336-37.] Dr. Applegate found that Cobb had "grossly normal strength and tone" in his lower extremities and "normal posture, normal sensation, and normal coordination and reflexes" in his spine. [Tr. 390.] And even Cobb admitted that he could "probably" lift about "30-40 pounds." [Tr. 67.]

[4] Cobb's reference to a "painful gait" is also noted in Dr. Applegate's physical exam findings. [Tr. 390.] It is unclear if Dr. Applegate based this notation on his own examination, or on Cobb's subjective report of a painful gait. In any case, one general reference to a "painful gait" does not outweigh the wealth of contrary evidence about Cobb's functional limitations.

[5] The ALJ did, however, appropriately afford "little weight" to Dr. Applegate's conclusory statement that "in [his] opinion" Cobb needed to use a cane. [Tr. 41, 385.] This comment appeared on an essentially blank sheet of paper, with no explanation of the basis for Dr. Applegate's supposed opinion. And the statement flatly contradicted Dr. Applegate's own physical examination from that same day, which found that Cobb had "grossly normal strength and tone" in his lower extremities and normal posture, normal sensation, and normal coordination and reflexes in his spine. [Tr. 388-391.] Summary, unsupported statements by examining physicians do not qualify as medical opinions. *See, e.g., Dunlap v. Comm'r of Soc. Sec.,* 509 F. App'x 472, 474 (6th Cir. 2012) (holding physician's conclusory statement that "in [his] medical opinion, [the claimant] ha[d] severe low back pain and due to his pain [was] unable to work" was not a true medical opinion).

(3d Cir. 2004) (holding that examining physician's report "post-surgery support[ed] the ALJ's conclusion that [the claimant] had recovered and was capable of performing other work.").

Cobb's second claim is that the ALJ should have ordered "follow-up consultative examinations by physicians qualified to evaluate" all of the symptoms identified in Dr. Ramsey's report. [R. 9-1 at 9.] ALJs have "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Further testing is required only if the existing "medical sources cannot or will not give [the ALJ] sufficient medical evidence about [the claimant's] impairment for [the ALJ] to determine whether [he is] disabled." 20 C.F.R. § 404.1517; *see also see Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

Two of the symptoms described by Dr. Ramsey—"spastic diplegia" and "spondylitic myelopathy"—apparently formed the basis of his decision to perform surgery on Cobb in August 2012. As explained above, Cobb testified that this surgery was successful. His follow-up visit with Dr. Applegate "showed [he] had normal muscle tone, strength, sensation, and range of motion in his neck, back, and in the upper and lower extremities." [Tr. 40.] He did not seek treatment from any source "until nearly ten months later," when he reported to Dr. Applegate that he was experiencing some back pain. [*Id.*] At the hearing, however, Cobb reported that he took medications for this pain, that the medication helped, and that he only took the pills "as needed." [Tr. 61-62.] He later admitted that he "just use[d] Aleve or something like that" to address the pain. [Tr. 73-74.] This testimony—coupled with (1) Cobb's express admission that the surgery was successful and (2) Dr. Applegate's comprehensive physical examination, which revealed none

7

of the pre-surgery diagnoses noted in Dr. Ramsey's report—provided more than enough evidence to support the ALJ's determination. No additional consultative examinations were necessary.

The other two symptoms mentioned in Dr. Ramsey's notes—"cachexia" and "encephalomalacia"—are largely irrelevant to the ALJ's decision.[6] Dr. Ramsey noted that Cobb "look[ed] a bit cachectic," suggesting that he showed some signs of malnutrition and muscle loss. [Tr. 368.] Cobb suggests that these symptoms "likely relate[d] to his chronic Hepatitis," but makes no attempt to explain how this Hepatitis diagnosis might plausibly relate to the stated bases for his disability application.[7] [R. 9-1 at 7.] Nor did Cobb ever seek to develop a record related to his Hepatitis diagnosis. *Cf. Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.").

Cobb also ignores the fact that no other report in the medical record makes any similar finding about Cobb's appearance. Dr. Owen made no mention of this issue. Dr. Applegate noted in October 2012 that Cobb was in "good general health," appeared "well nourished," and had "normal coloration of skin." [Tr. 388.] He made an identical finding in August 2012. [Tr. 393-

---

[6] Cobb also apparently argues that the ALJ should have ordered additional consultative examinations related to his mental health. In support, however, he simply states that "[c]onsultative examiner Emily Skaggs, Ph.D. diagnosed Mr. Cobb with generalized anxiety disorder and depressive disorder . . . and Mr. Cobb's wife reported that he was afraid of the dark." [R. 9-1 at 7.] He makes no attempt to explain why this evidence, standing alone, warranted additional examination. The Court reminds counsel that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995); *accord United States v. Hayter Oil Co.*, 51 F.3d 1265, 1269 (6th Cir. 1995). In any event, Dr. Skaggs's comprehensive psychological examination—which found that Cobb had only "mild" to "moderate" mental limitations that did not affect his ability to perform the jobs identified by the vocational expert—provided sufficient evidence to support the ALJ's decision. [Tr. 362, 41.] The opinion of agency consultant Mark Thompson corroborated Dr. Skaggs's assessment. [Tr. 41.] No additional investigation was necessary.

[7] These bases included "pain in his back and knees, numbness in the right hand and in the tips of his fingers in the left hand, and depression." [Tr. 38.]

94.] And both Dr. Owen and Dr. Applegate found that Cobb's muscle strength was within normal limits. [Tr. 336-37, 390, 402.] Even if Cobb could relate Dr. Ramsey's single observation to his claimed disability, this isolated report did not undermine the significant body of contrary evidence in the record.

As for Dr. Ramsey's apparent allusion to "encephalomalacia," the Court agrees with the Commissioner that this reference is "obviously a transcription error." [R. 10 at 12.] The parties both stipulate that "encephalomalacia" refers to a "softening of the brain tissues." [R. 9-1 at 3, R. 10 at 12.] Dr. Ramsey's note suggests that, when reviewing an "MRI of [Cobb's] cervical spine," he observed "multiple level spondylitic changes with cord compression and encephalomalacia and compression at the C4-5, 5-6 and 6-7 levels." [Tr. 369.] It is facially clear that "an MRI of [Cobb's] cervical spine" could not have revealed a "softening of [his] brain tissues." [Tr. 369, R. 9-1 at 3.] And Dr. Ramsey's report otherwise makes no reference to the condition of Cobb's brain. The ALJ properly ignored this error.

Finally, the Court adds that the ALJ reasonably found Cobb's testimony to be "only partially credible." [Tr. 39.] He correctly noted that parts of Cobb's "medical history [were] not consistent with his allegation of disability." [*Id.*] Cobb suggested, for example, that he had stopped working in 2008 because of his disability [Tr. 224], but later admitted that he had simply been laid off. [Tr. 59-60.] Rather than apply for disability at that time, he collected unemployment benefits for 18 months and continued to "look for the same work [that he] used to do." [Tr. 60.] His persistent search for employment strongly undermines his claim of disability during this period. *Bowden v. Comm'r Soc. Sec.*, 173 F.3d 854 (6th Cir. 1999) (unpublished table opinion) (recognizing "no reasonable explanation of how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that

9

[he] is ready and willing to work."). And as the Government observes, "the record is devoid of any [evidence of Cobb receiving] medical treatment between November 2008 and June 2012, a period of almost four years." [R. 10 at 9.]

The ALJ likewise noted that after his October 2012 visit with Dr. Applegate, Cobb "did not seek medical attention from any source until nearly 10 months later." [Tr. 40.] And his subjective complaints were never supported "by objective documents such as radiographic evidence, nerve conduction studies, or even [Dr. Applegate's] October 30, 2012 clinical findings." [*Id.*] This failure to seek treatment, considered alongside the absence of supporting evidence, also casts doubt on Cobb's testimony. *See, e.g., Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("[W]hen a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain.").

### III

Cobb understandably wishes the ALJ had given more weight to the evidence that most readily supported his disability claim. But it is not the role of this Court to resolve conflicts in evidence; rather, the Court must affirm the ALJ's decision as long as substantial evidence supports his decision. This is true even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *Ulman, 693 F.3d at 714*; *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Accordingly, the Court **HEREBY ORDERS** as follows:

1. Cobb's Motion for Summary Judgment [**R. 9**] is **DENIED**;

2. The Commissioner's Motion for Summary Judgment [**R. 10**] is **GRANTED**; and

3. **JUDGMENT** in favor of the Commissioner will be entered contemporaneously herewith.

This 26th day of September, 2016.

Gregory F. Van Tatenhove
United States District Judge